**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT. LAUDERDALE DIVISION**

**Case No.** ___0:21-cv-6257___

DIANNE SOLDEVILLA, on
behalf of herself and all others
similarly situated,

        Plaintiffs,

vs.

THRIVING BRANDS LLC and
HENKEL CORPORATION;

        Defendants.

**CLASS ACTION COMPLAINT**

Plaintiff Dianne Soldevilla ("Plaintiff"), on behalf of herself and all others similarly situated, file this Class Action Complaint ("CAC") against Defendants Thriving Brands LLC and Henkel Corporation (collectively "Defendants"), and in support states the following:

**NATURE OF THE ACTION**

1.     This is a class action lawsuit by Plaintiff, and others similarly situated, who purchased certain aerosol antiperspirant sprays manufactured, sold and distributed by Defendants. Defendants distribute, markets and sell several over-the-counter Aerosol Antiperspirant Products under their brand name "Right Guard" (the "Aerosol Antiperspirant Products"). Several of Defendants' Aerosol Antiperspirant Products (identified below) have been independently tested and shown to be adulterated and/or contaminated with benzene, a known human carcinogen. The presence of benzene in Defendants' Aerosol Antiperspirant Products was not disclosed in the

products' label or advertising, in violation of state and federal law. Plaintiff and the putative class suffered economic damages due to Defendants' misconduct (as set forth below) and seek injunctive relief and restitution for the full purchase price of the Aerosol Antiperspirant Product(s) purchased. Plaintiff alleges the following based upon personal knowledge as well as investigation by counsel, and as to all other matters, upon information and belief. Plaintiff further believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

2.      This Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are in excess of 100 class members and Plaintiff is a citizen of a state different from Defendants.

3.      This Court has jurisdiction over Defendants because it is authorized to conduct and do business in Florida. Defendants has marketed, promoted, distributed, and sold antiperspirant products, including the Aerosol Antiperspirant Products identified below, in Florida and Defendants have sufficient minimum contacts with this state and/or sufficiently availed themselves of the markets in this state through promotion, sales, distribution and marketing to render the exercise of jurisdiction by this Court permissible.

4.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) and (b) because a substantial part of the events or omissions giving rise to Plaintiff Diane Soldevilla's claims occurred in this judicial district. Venue is also proper under 18 U.S.C. §1965(a) because Defendants transacts substantial business in this district.

## THE PARTIES

5.      At all relevant times, Plaintiff Dianne Soldevilla "(Soldevilla") was a citizen and resident of St. Lucie County, Florida. Soldevilla has purchased and used Right Guard aerosol deodorant products for decades, purchasing approximately 8-10 bottles per year. Most recently, in July 2021, Soldevilla purchased Right Guard Sport aerosol deodorant from Walgreens and/or Walmart in St. Lucie County, Florida for approximately $4.00 to $5.00 per bottle. During that time, based on the false and misleading claims by Defendants, Soldevilla was unaware that Defendants' Aerosol Antiperspirant Products were adulterated with benzene. Soldevilla purchased the Defendants' Aerosol Antiperspirant Products on the assumption that the labeling of Defendants' Aerosol Antiperspirant Products was accurate and that the products were unadulterated, safe and effective. Soldevilla would not have purchased Defendants' Aerosol Antiperspirant Products had she known the Aerosol Antiperspirant Products contain benzene, a known human carcinogen. As a result, Soldevilla suffered injury in fact when she spent money to purchase products she would not otherwise have purchased absent Defendants' misconduct, as alleged herein.

6.      Defendant Thriving Brands LLC ("Thriving Brands") is an Ohio corporation with its principal place of business at 8170 Corporate Part Drive, Suite 143, Cincinnati, OH 45242. Thriving Brands conducts business throughout the United States, including this district. Thriving Brands purchased the Right Guard line of products, including the Aerosol Antiperspirant Products, from Henkel corporation in 2021. Thriving Brands manufactures and/or distributes its products, including the Aerosol Antiperspirant Products purchased by Plaintiff and the class members, throughout the United States including this district.

7.      Defendant Henkel Corporation ("Henkel") is a Connecticut corporation with its principal place of business at 1 Henkel Way, Rocky Hill, CT 06067. Henkel conducts business

throughout the United States, including this district. Henkel manufactures and/or distributes its products, including the Aerosol Antiperspirant Products purchased by Plaintiff and the class members, throughout the United States including this district.

## INTRODUCTION

9.      Defendants manufacture, market, advertise, label, distribute, and sell a variety of antiperspirants and deodorant products, including:

| 1 | Right Guard | Antiperspirant | Sport, Fresh, Up to 48 Hour Odor Protection |
|---|---|---|---|
| 2 | Right Guard | Antiperspirant | Sport, Powder Dry, Up to 48 Hour Odor Protection[1] (hereafter collectively referred to as "Aerosol Antiperspirant Products") |

10.     In 2021, Valisure LLC and ValisureRX LLC ("Valisure"), an analytical pharmacy, ran tests on a variety of Defendants' Aerosol Antiperspirant Products. In some cases, Valisure, engaged the Chemical and Biophysical Instrumentation Center at Yale University ("Yale") to conduct simultaneous testing to help ensure validity of results. Through its testing, Valisure discovered that certain of the Aerosol Antiperspirant Products contain benzene, with values ranging from <0.1 parts per million ("ppm") to >0.1 ppm to more than 2 ppm. *See generally* Valisure Citizen Petition dated Nov. 3, 2021 (attached as Exhibit A). Notably, the Right Guard Sport Fresh antiperspirant analysis returned values of 5.00 ppm benzene (per Valisure) and 5.07 ppm benzene (per Yale).

11.     Benzene is used primarily in the chemical and pharmaceutical industries, as a starting material and intermediate in the synthesis of numerous chemicals, and in gasoline. The

---

[1]  Discovery may reveal additional Aerosol Antiperspirant Products manufactured, sold, and distributed by Defendants that are affected by this action and Plaintiffs reserve their right to include any such products in this action.

major United States source of benzene is petroleum. The health hazards of benzene have been recognized for over one hundred years. Benzene was "[f]irst evaluated by IARC in 1974 . . . and was found to be carcinogenic to humans (Group 1), a finding that has stood since that time."[2] As noted by the IARC:

> In the current evaluation, the Working Group again confirmed the carcinogenicity of benzene based on *sufficient evidence* of carcinogenicity in humans, *sufficient evidence* of carcinogenicity in experimental animals, and *strong* mechanistic evidence. … The Working Group affirmed the strong evidence that benzene is genotoxic, and found that it also exhibits many other key characteristics of carcinogens, including in exposed humans. In particular, benzene is metabolically activated to electrophilic metabolites; induces oxidative stress and associated oxidative damage to DNA; is genotoxic; alters DNA repair or causes genomic instability; is immunosuppressive; alters cell proliferation, cell death, or nutrient supply; and modulates receptor-mediated effects.[3]

12.     The Food and Drug Administration ("FDA") similarly recognizes that "[b]enzene is a carcinogen that can cause cancer in humans"[4] and classifies benzene as a "Class 1" solvent that should be "avoided."[5] And the National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "skin absorption" as an exposure route.[6] According to the National Toxicology Program ("NTP"), benzene is "*known to be a human carcinogen* based on sufficient evidence of carcinogenicity from studies in humans."[7]

---

[2] Benzene / IARC Working Group on the Evaluation of Carcinogenic Risks to Humans (2017: Lyon, France), at p. 33.

[3] *Id*. at 34.

[4] https://www.fda.gov/food/chemicals/questions-and-answers-occurrence-benzene-soft-drinksand-other-beverages#q1.

[5] https://www.fda.gov/media/71737/download.

[6] Centers for Disease Control and Prevention. *The National Institute for Occupational Safety and Health (NIOSH), Benzene* (https://www.cdc.gov/niosh/npg/npgd0049.html).

[7] http://ntp.niehs.nih.gov/go/roc/content/profiles/benzene.pdf (emphasis added).

13.     The FDA regulates antiperspirants to ensure they meet safety and effectiveness standards.[8] The FDA regulates antiperspirants as over-the-counter ("OTC") drugs; deodorants are regulated as cosmetics; and antiperspirant-deodorants are regulated as both cosmetics and drugs, meaning they must meet the requirements for both.[9] The FDA defines "Antiperspirant" as a "drug product applied topically that reduces the production of perspiration (sweat) at that site."[10] The FDCA defines "cosmetics" by their intended use, as "articles intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body...for cleansing, beautifying, promoting attractiveness, or altering the appearance[.]" Federal Food, Drug, and Cosmetic Act § 201(i). As an FDA-regulated product, antiperspirants and deodorants must pass certain tests before they are sold.

14.     Per the FDA regulations governing Defendants' Aerosol Antiperspirant Products, titled "Antiperspirant Drug Products for Over-the-Counter Human Use,"[11] there are certain acceptable active ingredients in products that are labeled as antiperspirant.[12] Benzene, a known human carcinogen, is not on the FDA's list of acceptable active ingredients for Aerosol Antiperspirant Products or deodorants. Nor has benzene been authorized by FDA to be used as a residual solvent in the manufacture of Aerosol Antiperspirant Products or deodorants. Despite this, Defendants' Aerosol Antiperspirant Products have been found by Valisure, an independent laboratory, to contain various amounts of benzene, including at excessive levels (i.e. >0.1 ppm). Whether characterized as an ingredient, inactive ingredient, or residual solvent, Defendants'

---

[8] 21 C.F.R. § 350.10.
[9] https://www.fda.gov/cosmetics/resources-consumers-cosmetics/cosmetics-safety-qa-personal-care-products.
[10] 21 C.F.R. § 350.3.
[11] 21 C.F.R. § 350.10.
[12] 21 C.F.R. § 350.10.

failure to disclose to consumers, including Plaintiff and members of the putative class, that its Aerosol Antiperspirant Products contain benzene is misleading.

15.     FDA's Guidance for Industry Q3C provides that "Solvents in Class 1 [i.e. benzene]. . . should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicities or deleterious environmental effect."[13] That provision provides in full:

> III. SOLVENTS GROUPED BY CLASS
>
> Solvents in Class 1 [i.e. benzene] should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity or their deleterious environmental effect. However, if their use is unavoidable in order to produce a drug product with a significant therapeutic advance, then their levels should be restricted … [to 2 ppm], unless otherwise justified.[14]

16.     Thus, although benzene should not be employed in the manufacture of drug substances, it may be used in manufacturing some drug substances when (1) its use is "unavoidable" to produce a drug product with (2) "significant therapeutic advance." As demonstrated by Valisure's findings, however, the use of benzene in Aerosol Antiperspirant Products is not unavoidable and Aerosol Antiperspirant Products do not represent a significant therapeutic advance. First, the use of benzene in making Aerosol Antiperspirant Products is not "unavoidable" because some of the Aerosol Antiperspirant Products tested by Valisure, including Defendants', did not contain detectable levels of benzene (e.g., Right Guard Sport, Original) Ex. A. (Valisure Citizen Petition, at p. 16.) Given that benzene was detected by

---

[13] FDA Guidance for Industry, Q3C Impurities: Residual Solvents (6/30/2017), available at https://www.fda.gov/media/71736/download.
[14] Food and Drug Administration, Q3C – Tables and List Guidance for Industry (2017) (https://www.fda.gov/media/71737/download).

Valisure in some of Defendants' Aerosol Antiperspirant Products but not in others is evidence in itself that benzene is not required in its manufacture. Second, Aerosol Antiperspirant Products do not represent a "significant therapeutic advance." Indeed, the FDA has never considered the Aerosol Antiperspirant Products as representing a "significant therapeutic advance." Moreover, considering the long history and widespread use of Aerosol Antiperspirant Products, it does not appear that Aerosol Antiperspirant Products constitute a significant therapeutic advance. Ex. A (Valisure Citizen Petition, at p. 1-2).

Notably, benzene is not listed as an active or inactive ingredient (or otherwise identified as being present) on any of the labels of Defendants' Aerosol Antiperspirant Products. Neither is the use of benzene as a "residual solvent" in the manufacturing of Aerosol Antiperspirant Products specifically authorized by FDA.[15] Similar to FDA's Guidance for Industry Q3C, the FDA's Residual Solvent Guidance on the use of "residual solvents" for drug products (USP General Chapter ) provides that because Class 1 cancer causing agents (like benzene) do not "provide therapeutic benefit," they should be "avoided" absent a showing that their use is "strongly justified" in a risk-benefit analysis. General Chapter 467 provides:

> Because residual solvents do not provide therapeutic benefit, they should be removed, to the extent possible, to meet ingredient and product specifications, good manufacturing practices, or other quality-based requirements. Drug products should contain no higher levels of residual solvents than can be supported by safety data. Solvents that are known to cause unacceptable toxicities (Class 1, Table 1) [e.g., benzene] should be avoided in the production of drug substances, excipients, or drug products unless their use can be strongly justified in a risk-benefit assessment.[16]

---

[15] *See* Residual Solvent Guidance, "Residual Solvents in Drug Products Marketed in the United States" (2009) (applying standards in USP General Chapter <467> Residual Solvents).

[16]  https://www.uspnf.com/sites/default/files/usp_pdf/EN/USPNF/generalChapter467Current.pdf (USP General Chapter Residual Solvents).

17.     Upon information and belief, Defendants has never conducted a "risk benefit assessment" regarding the use of benzene as a residual solvent in Aerosol Antiperspirant Products, much less "strongly justified" its use before the FDA. Nor is the use of benzene as a residual solvent in manufacturing Aerosol Antiperspirant Products "supported by the safety data" in light of the known health risks associated with exposure to benzene as detailed below.

18.     On November 3, 2021, Valisure filed a citizen petition with the Food and Drug Administration ("FDA") asking the agency to recall all batches of Defendants' Aerosol Antiperspirant Products containing (as tested) 0.1 ppm or more of benzene on the basis that they are adulterated under Section 501 of the FDCA (21 U.S.C. § 351) and misbranded under Section 502 of the FDCA (21 U.S.C. § 352).

19.     The governing regulations regarding antiperspirants provide: "An over-the-counter antiperspirant drug product in a form suitable for topical administration is generally recognized as safe and effective and is not misbranded if it meets each condition in this part and each general condition established in 330.1 of this chapter."[17] Defendants failed to meet this standard as further described below.

20.     The manufacture of any misbranded or adulterated drug is prohibited under federal law[18] and Florida state law.[19]

21.     The manufacture within any Territory of any drug or cosmetic that is adulterated or misbranded is prohibited.[20]

---

[17] 21 CFR §352.1
[18] 21 U.S.C. §331(g).
[19] *See* Fla. Stat. § 499.005(1) ("It is unlawful for a person to perform or cause the performance of any of the following acts in this state: (1) The manufacture, repackaging, sale, delivery, or holding or offering for sale of any drug, device, or cosmetic that is adulterated or misbranded or has otherwise been rendered unfit for human or animal use.").
[20] 21 U.S.C. §331(a); Fla. Stat. § 499.005(1).

22.     The adulteration or misbranding of any drug or cosmetic in interstate commerce is prohibited.[21]

23.     The introduction into commerce of any misbranded or adulterated drug or cosmetic is similarly prohibited.[22]

24.     The receipt in interstate commerce of any adulterated or misbranded drug or cosmetic is also unlawful.[23]

25.     Among the ways a drug may be adulterated are:

> (1) If it consists in whole or in part of any filthy, putrid, or decomposed substance; or (2)(A) if it has been prepared, packed, or held under unsanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health; or (B) if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety . . . and meets the quality and purity characteristics, which it purports or is represented to possess. . . .[24]

29.      A drug or cosmetic is misbranded:

---

[21] 21 U.S.C. §331(b); Fla. Stat. § 499.005(2).

[22] 21 U.S.C. §331(a); Fla. Stat. § 499.005(1).

[23] 21 U.S.C. §331(c); *see also* Fla. Stat. § 499.005(3)("It is unlawful for a person to perform or cause the performance of any of the following acts in this state: … (3) The receipt of any drug, device, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery of such drug, device, or cosmetic, for pay or otherwise.").

[24] 21 U.S.C. §351(a)(2)(B); *see also* Fla. Stat. § 499.006(1)-(3) ("A drug or device is adulterated, if any of the following apply: (1) It consists in whole or in part of any filthy, putrid, or decomposed substance[;] (2) It has been produced, prepared, packed, or held under conditions whereby it could have been contaminated with filth or rendered injurious to health[;] (3) It is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to, or are not operated or administered in conformity with, current good manufacturing practices to assure that the drug meets the requirements of this part and that the drug has the identity and strength, and meets the standard of quality and purity, which it purports or is represented to possess.").

(a) "If its labeling is false or misleading in any particular,"[25]

(b) If the labeling does not contain, among other things, "the proportion of each active ingredient[.]"[26]

(d) "If it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof."[27]

30.     If a manufacturer labels a drug but omits ingredients, that renders the drug misbranded.[28]

31.     Similarly, a cosmetic is misbranded if the labeling or advertising is misleading.[29]

32.     Defendants did not disclose benzene, a known human carcinogen, is present in the Aerosol Antiperspirant Products purchased by Plaintiff and the putative class members. As a result of benzene contamination in the Aerosol Antiperspirant Products, they are considered adulterated and misbranded. There is no "no safe level of benzene" exposure, so it is unsuitable

---

[25] 21 U.S.C. §352(a)(1) (drug); 21 U.S.C. §362(a) (cosmetic); *see also* Fla. Stat. § 499.007(1) (A drug is misbranded "[i]f its labeling is in any way false or misleading.").

[26] 21 U.S.C. §352(e)(1)(A)(ii). *See also* Fla. Stat. § 499.007(2)(b) ("A drug or device is misbranded: … (2) If in package form, it does not bear a label containing: (b) An accurate statement of the quantity of the contents in terms of weight, measure, or numerical count.").

[27] 21 U.S.C. §352(j); *see also* Fla. Stat. § 499.007(10) (A drug is misbranded "[i]f it is dangerous to health when used in the dosage or with the frequency or duration prescribed, recommended, or suggested in the labeling of the drug.").

[28] 21 C.F.R. §§201.6. "The labeling of a drug may be misleading by reason (among other reasons) of: … (2) Failure to reveal the proportion of, or other fact with respect to, an ingredient present in such drug, when such proportion or other fact is material in the light of the representation that such ingredient is present in such drug." 21 C.F.R. §201.10(2). *See also* Fla. Stat. § 499.007(2)(b) ("A drug or device is misbranded: … (2) If in package form, it does not bear a label containing: (b) An accurate statement of the quantity of the contents in terms of weight, measure, or numerical count.").

[29] *See* 21 U.S.C. § 321(n) ("If an article is alleged to be misbranded because the labeling or advertising is misleading, then in determining whether the labeling or advertising is misleading there shall be taken into account ... the extent to which the labeling or advertising fails to reveal facts *material* in the light of such representations or *material* with respect to consequences which may result from the use of the article ....").

for human application in antiperspirant.[30]

33.     Defendants wrongfully advertised and sold the Aerosol Antiperspirant Products without any labeling to indicate to consumers that these products contain benzene. The following image is illustrative of the labels contained on the Aerosol Antiperspirant Products purchased by Plaintiff and the class members:

---

[30] https://www.who.int/ipcs/features/benzene.pdf.





34.     Florida law specifically provides that a drug is adulterated "[i]f it has been

produced . . . under conditions whereby it could have been contaminated with filth *or* rendered

injurious to health." Fla. Stat. § 499.006(3) (emphasis added). Here, the Aerosol Antiperspirant

Products violate both provisions: they were (1) produced under conditions whereby they were

contaminated with filth (i.e. benzene) and (2) produced under conditions which could render them injurious to health due to the presence of benzene.[31]

35.     Plaintiff has standing to represent members of the putative class because there is sufficient similarity between the specific Aerosol Antiperspirant Products purchased by the Plaintiff and the other Aerosol Antiperspirant Products not purchased by Plaintiff. Specifically, each and every one of Defendants' Aerosol Antiperspirant Products (i) are marketed in substantially the same way – as "Antiperspirant" and/or "Deodorant"— and (ii) fail to include labeling indicating to consumers that the Aerosol Antiperspirant Products contain benzene at levels that are potentially dangerous to human health when used as directed. Accordingly, the misleading effect of all of the Aerosol Antiperspirant Products are substantially the same.

36.     Had Plaintiff and members of the putative class known that *any* of the Aerosol Antiperspirant Products were contaminated with benzene at levels that are potentially harmful, they would not have purchased *any* of Defendants' Aerosol Antiperspirant Products. Thus, Plaintiff and members of the putative class have "lost money" by purchasing products they would not have otherwise purchased but for Defendants' misrepresentations. The decision to purchase or not purchase Aerosol Antiperspirant Products that contain benzene at any level is a financial and healthcare decision that affects the Plaintiff and members of the putative class in a personal and individual way, thus conferring a particularized injury. By failing to disclose the presence of benzene in its Aerosol Antiperspirant Products, Plaintiff and members of the putative class have been denied the opportunity to make those informed decisions. As a result, Plaintiff and members of the putative class have Article III standing.

---

[31]   https://www.who.int/ipcs/features/benzene.pdf.  (World Health Organization noting that "[b]enzene is carcinogenic to humans, and no safe level of benzene can be recommended.")

## CLASS ALLEGATIONS

37.     Plaintiff brings this action on behalf of herself and all other similarly situated

class members (hereafter the "Class") pursuant to Rule 23(a), (b)(2) and (b)(3) of the

Federal Rules of Civil Procedure and seeks certification of the following class against

Defendants for violations of Florida state laws and/or similar laws in other states:

### Nationwide Class Action

> All consumers who purchased any Right Guard aerosol spray
> antiperspirant or deodorant products in the United States of America
> and its territories from December 28, 2017 to the present for
> personal use or consumption.

> Excluded from the Class are individuals who allege personal bodily
> injury resulting from the use of Right Guard aerosol spray
> antiperspirants or deodorant products. Also excluded from this Class
> are Defendants, any parent companies, subsidiaries, and/or
> affiliates, officers, directors, legal representatives, employees, co-
> conspirators, all governmental entities, and any judge, justice or
> judicial officer presiding over this matter.

38.     In the alternative, Plaintiff brings this action on behalf of herself and all other

similarly situated Florida consumers pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal

Rules of Civil Procedure and seeks certification of the following Sub-Classes:

### Florida Sub-Class

> All consumers who purchased any Right Guard aerosol spray
> antiperspirant or deodorant product in the State of Florida from
> December 28, 2021 to the present for personal use or consumption.

> Excluded from the Class are individuals who allege personal bodily
> injury resulting from the use of Right Guard aerosol spray
> antiperspirants or deodorant products. Also excluded from this Class
> are Defendants, any parent companies, subsidiaries, and/or
> affiliates, officers, directors, legal representatives, employees, co-
> conspirators, all governmental entities, and any judge, justice or
> judicial officer presiding over this matter.

39.     The members of the Class are so numerous that joinder of all members of the

Class is impracticable. Plaintiff are informed and believe that the proposed Class contains thousands of purchasers of Defendants' Aerosol Antiperspirant Products who have been damaged by Defendants' conduct as alleged herein. The precise number of Class members is unknown to Plaintiff at this time.

40.    Plaintiff's claims are typical to those of all class members because members of the class are similarly injured through Defendants' uniform misconduct described above and were subject to Defendants' deceptive claims that accompanied each and every Aerosol Antiperspirant Product in Defendants' collection. Plaintiff are advancing the same claims and legal theories on behalf of herself and all members of the Class.

41.    Plaintiff's claims raise questions of law and fact common to all members of the Class, and they predominate over any questions affecting only individual Class members. The claims of Plaintiff and all prospective Class members involve the same alleged defect. These common legal and factual questions include the following:

(a)    whether Defendants' Aerosol Antiperspirant Products contain benzene;

(b)    whether Defendants' omissions are true, or are misleading, or objectively reasonably likely to deceive;

(c)    whether the alleged conduct constitutes violations of the laws asserted;

(d)    whether Defendants' alleged conduct violates public policy;

(e)    whether Defendants engaged in false or misleading advertising;

(f)    whether Defendants were unjustly enriched as a result of their labeling, marketing, advertising and/or selling of the Aerosol Antiperspirant Products;

(g)    whether Plaintiff and the Class members are entitled to damages and/or restitution and the proper measure of that loss; and

(h)   whether an injunction is necessary to prevent Defendants from continuing to market and sell defective and adulterated Aerosol Antiperspirant Products that contain benzene, a known human carcinogen.

42.     Plaintiff and her counsel will fairly and adequately protect and represent the interests of each member of the Class. Plaintiff has retained counsel experienced in complex litigation and class actions. Plaintiff's counsel has successfully litigated other class action cases similar to those here and have the resources and abilities to fully litigate and protect the interests of the Class. Plaintiff intend to prosecute this claim vigorously. Plaintiff have no adverse or antagonistic interests to those of the Class, nor are Plaintiff subject to any unique defenses.

43.     A class action is superior to the other available methods for a fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by the Plaintiff and individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for Plaintiff and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Further, it is desirable to concentrate the litigation of the Class members' claims in one forum, as it will conserve party and judicial resources and facilitate the consistency of adjudications. Plaintiff knows of no difficulty that would be encountered in the management of this case that would preclude its maintenance as a class action.

44.     The Class also may be certified because Defendants has acted or refused to act on grounds applicable to the Class, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

45.     Plaintiff seeks preliminary and permanent injunctive and equitable relief on behalf

of the entire Class, on grounds generally applicable to the entire Class, to enjoin and prevent Defendants from engaging in the acts described above, such as continuing to market and sell Aerosol Antiperspirant Products that are adulterated with benzene, and requiring Defendants to provide a full refund of the purchase price of the Aerosol Antiperspirant Products to Plaintiff and Class members.

46.     Unless a class is certified, Defendants will retain monies received as a result of their conduct that were taken from Plaintiff and the Class members. Unless a Class-wide injunction is issued, Defendants will continue to commit the violations alleged and the members of the Class and the general public will continue to be misled.

<u>COUNT I</u>

**<u>Violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201-213</u>**

**(On Behalf of Plaintiff Soldevilla and the Florida Sub-Class)**

47.     Plaintiff Dianne Soldevilla incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

48.     Plaintiff Soldevilla brings this Count individually and on behalf of the Florida Sub-Class.

49.     The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts or practice, and unfair or deceptive acts or practices in the conduct of any trade or commerce. § 501.204, Fla. Stat.

50.     Among other purposes, FDUTPA is intended "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202, Fla. Stat.

51.     As alleged herein, Plaintiff and the Class members have suffered injury in fact and lost money as a result of Defendants' conduct because they purchased Aerosol Antiperspirant Products from Defendants in reliance on Defendants' representation that the ingredients in their Aerosol Antiperspirant Products were safe and effective and were not adulterated with benzene, a known human carcinogen.

52.     As alleged herein, Defendants' actions are deceptive and in clear violation of FDUTPA, entitling Plaintiff and the Class to damages and relief under Fla. Stat. §§ 501.201-213.

53.     Defendants has engaged, and continues to engage, in conduct that is likely to deceive members of the public. This conduct includes failing to make any mention that its Aerosol Antiperspirant Products are adulterated with benzene, a known human carcinogen.

54.     Similarly, Defendants have engaged, and continue to engage, in deceptive, untrue, and misleading advertising by continuing to promote and sell Aerosol Antiperspirant Products that have been found by Valisure and Yale to be contaminated with benzene. Defendants also mislead consumers by promising, among other things, that (i) "[a]ll raw materials and finished products are subjected to numerous assessments and tests to ensure a high level of safety during production, use and disposal"[32]; (ii) "that the safety of our [Henkel] products . . . [is] an essential part of operating our business in an ethically and legally appropriate manner"[33]; (iii) "Henkel makes great efforts to ensure the safety of our products for people and the environment"[34]; and (iv) the inactive ingredient isobutene used as a propellant in Right Guard Sport Aerosol Antiperspirant – Fresh is non-carcinogenic per IARC and OSHA standards,[35] both of which

---

[32] https://www.henkel.com/sustainability/positions/product-safety.
[33] https://www.henkel.com/sustainability/positions/product-safety#Tab-806682_1.
[34] https://www.henkel.com/sustainability/positions/product-safety#Tab-806682_1.
[35] https://mysds.henkel.com/SAP_GATEWAY/odata/SAP/YPSSWH_DOO_SRV//DocContentSet(

statements are untrue insofar as, upon information and belief, the raw material isobutane used as a propellant in Right Guard Sport Aerosol Antiperspirant – Fresh (and Defendants' other Aerosol Antiperspirant Products) is contaminated with benzene and both the IARC[36] and OSHA[37] classify benzene as a toxic and hazardous substance which is carcinogenic to humans.  Plaintiff and the putative Class members were exposed to one or more of these representations during the class period and relied on one or more of these representations in deciding to purchase Defendants' Aerosol Antiperspirant Products.

55.     By committing the acts alleged above, Defendants has engaged in unconscionable, deceptive, or unfair acts or practices, which constitute unfair competition within the meaning of FDUTPA.[38]

56.     Defendants' conduct is substantially injurious to consumers. Consumers are purchasing and using Defendants' Aerosol Antiperspirant Products without knowledge that the Aerosol Antiperspirant Products are contaminated with a human carcinogen. This conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have paid for antiperspirants contaminated with benzene but for Defendants' false labeling, advertising, and promotion. Thus, Plaintiff and the putative Class have been "aggrieved" (i.e. lost money) as required for FDUTPA standing, and such an injury is not outweighed by any countervailing benefits to consumers or competition.

---

Appid='YPSSW_SDSUK',Matnr=",Matnrcomp=",Subid='000000544611',Subidcomp=",Sbgvid=
'MSDS_B_US-US',Laiso='EN')/DocContentData/$value.
[36] Benzene / IARC Working Group on the Evaluation of Carcinogenic Risks to Humans (2017: Lyon, France), at pp. 33-34.
[37] https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.1028.
[38] Defendants' conduct violates Section 5 of the Federal Trade Commission "("FTC") Act, 15 U.S.C. § 45, which prohibits unfair methods of competition and unfair or deceptive acts or practices in or affecting commerce.

57.     Indeed, no benefit to consumers or competition results from Defendants' conduct. Since consumers reasonably rely on Defendants' labeling of the ingredients and other information disclosing what is contained in the Aerosol Antiperspirant Products and injury resulted from ordinary use of the Aerosol Antiperspirant Products, consumers could not have reasonably avoided such injury.

58.     Further, Defendants' conduct is ongoing and continuing, such that prospective injunctive relief is necessary. Plaintiff is a long time users of Defendants' Aerosol Antiperspirant Products, and she desire to purchase Defendants' Aerosol Antiperspirant Products in the future if she can be assured that the Aerosol Antiperspirant Products are unadulterated and meet the advertising claims. Absent injunctive relief, Defendants may continue to advertise, promote and sell adulterated Aerosol Antiperspirant Products that deceive the public as to their ingredients, contents and/or safety. Plaintiff is thus likely to again be wronged in a similar way. For example, if Plaintiff or the Class members encounter Defendants' Aerosol Antiperspirant Products in the future and there is a risk those products still contain benzene, Plaintiff or Class members may mistakenly rely on the product's label to believe that Defendants' eliminated benzene when they did not.

59.     Florida Statutes, Section 501.204, makes unfair and/or deceptive trade practices in the conduct of any trade or commerce illegal.

60.     Florida Statutes, Section 501.211, creates a private right of action for individuals who are aggrieved by an unfair and/or deceptive trade practice by another person.

61.     Florida Statutes, Section 501.2105, provides that the prevailing party in litigation arising from a cause of action pursuant to Chapter 501 shall be entitled to recover attorney's fees within the limitations set forth therein form the non-prevailing party.

62.     Florida Statutes, Section 501.213, provides that any remedies available under Chapter 501 are in addition to any other remedies otherwise available for the same conduct under state or local law.

63.     Florida Statutes, Section 501.203 (3)(c), states that a person has violated the FDUTPA if he violates "any law, statute, rule, regulation, or ordinance which proscribes unfair, deceptive, or unconscionable acts or practices."

64.     Defendants is engaged in the practice of manufacturing, marketing, distributing, selling and otherwise placing into the stream of commerce Aerosol Antiperspirant Products which constitutes trade and commerce as defined by Sections 501.203(8) Fla. Stat., and is therefore subject to FDUPTA.

65.     As a result of Defendants' unfair and deceptive trade practices, Plaintiff and the Class members are entitled to an award of attorney's fees pursuant to FDUTPA, Florida Statutes, Section 501.2105, if they prevail.

66.     Wherefore, Plaintiff Soldevilla and the Florida Sub-Class, pray for judgement against Defendants, as set forth hereafter. Defendants' conduct with respect to the labeling, advertising, marketing, and sale of their Aerosol Antiperspirant Products is unfair because Defendants' conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

67.     In accordance with FDUTPA,[39] Plaintiff Soldevilla, and the Florida Sub-Class, seek an order enjoining Defendants from continuing to conduct business through fraudulent or

---

[39] Section 501.211(1) allows "anyone aggrieved by a violation of" FDUTPA to seek declaratory or injunctive relief. Fla. Stat. §501.211.

unlawful acts and practices and to commence a corrective advertising campaign. Defendants'

conduct is ongoing and continuing, such that prospective injunctive relief is necessary.

68.     On behalf of Plaintiff Soldevilla and the Class, Plaintiff also seek an order

entitling them to recover all monies spent on the Defendants' Aerosol Antiperspirant Products,

which were acquired through acts of fraudulent, unfair, or unlawful competition.[40] In addition,

the measure of restitution should be full refund of the purchase price insofar as the Aerosol

Antiperspirant Products and their associated labels are worthless. But for Defendants'

misrepresentations and omissions, Plaintiff and Class members would have paid nothing for

Aerosol Antiperspirant Products that contain benzene. Indeed, there is no discernible "market"

for an over-the-counter antiperspirant product that is adulterated with a known human

carcinogen. As recognized by the WHO, "[b]enzene is carcinogenic to humans, and no safe level

of benzene can be recommended."[41] As a result, the Defendants' Aerosol Antiperspirant

Products are rendered valueless.

69.     Wherefore, Plaintiff Soldevilla and members of the Class are entitled to injunctive

and equitable relief, and a full refund in the amount they spent on the Defendants' Aerosol

Antiperspirant Products.

## COUNT II

### Unjust Enrichment

### (On Behalf of the Nationwide Class and All State Classes)

70.     Plaintiff incorporates by reference and re-allege each and every allegation

contained above, as though fully set forth herein.

---

[40] Section 501.211(2) provides that "a person who has suffered a loss as a result of a [FDUTPA] violation ... may recover actual damages . . . ."
[41] https://www.who.int/ipcs/features/benzene.pdf.

71.     As a result of Defendants' wrongful and deceptive conduct alleged herein, Defendants knowingly and voluntarily accepted and retained wrongful benefits in the form of money paid by the Plaintiff and members of the Class when they purchased the Aerosol Antiperspirant Products.

72.     In so doing, Defendants acted with conscious disregard for the rights of Plaintiff and members of the Class.

73.     As a result of Defendants' wrongful conduct as alleged herein, Defendants has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class.

74.     Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

75.     Under the common law doctrine of unjust enrichment, it is inequitable for Defendants to be permitted to retain the benefits it received, and is still receiving, without justification, from the false and deceptive labeling and marketing of the Aerosol Antiperspirant Products to Plaintiff and members of the Class.

76.     Defendants' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

77.     The financial benefits derived by Defendants rightfully belong to Plaintiff and members of the Class.

78.     Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and members of the Class all wrongful or inequitable proceeds received by them.

79.     Finally, Plaintiff and members of the Class may assert an unjust enrichment claim

even though a remedy at law may otherwise exist.[42]

## COUNT III

### Negligent Misrepresentation/Omission

### (On Behalf of the Nationwide Class and All State Classes)

80.     Plaintiff incorporates by reference and re-allege each and every allegation

contained above, as though fully set forth herein.

81.     Through its labeling and advertising, Defendants made representations to the

Plaintiff and the Class members concerning the content of its Aerosol Antiperspirant Products.

82.     Defendants have a duty to provide accurate information to consumers with respect

to the contents of its Aerosol Antiperspirant Products as detailed above.

83.     Defendants failed to fulfill their duty to accurately disclose, through its labeling,

advertising or otherwise, that its Aerosol Antiperspirant Products contain benzene.

84.     Additionally, Defendants have a duty to not make false representations with

respect to its Aerosol Antiperspirant Products.

85.     Defendants failed to fulfill this duty when it made false representations regarding

the quality and safety of the Aerosol Antiperspirant Products as detailed above.

86.     Such failures to disclose on the part of Defendants amounts to negligent omission

and the representations regarding the quality and safety of the product amount to negligent

misrepresentation.

---

[42] *See State Farm Mut. Auto Ins. Co. v. Physicians Injury Care Ctr.,* 427 F. App'x 714, 723 (11th Cir. 2011), *rev'd on other grounds*, 824 F.3d 1311 (The general rule that "equitable remedies are not available under Florida law when adequate legal remedies exist . . . does not apply to unjust enrichment claims."); *see also Morris v. ADT Sec. Services*, 580 F.Supp.2d 1305, 1312-13 (S.D. Fla. 2008); *In re Monat Hair Prods. Mktg., Sales Prac., and Prods. Liab. Litig.*, 2019 WL 5423457, at *5 (S.D. Fla. Oct. 23, 2019); *Garcia v. Clarins USA, Inc.*, 2014 WL 11997812, at *5 (S.D. Fla. Sept. 5, 2014); *Goldberg v. Chong,* 2007 WL 2028792 at *9 (S.D. Fla. July 11, 2007).

87.     Defendants' conduct constitutes fraud in the inducement in that it occurred in connection with misrepresentations, statements or omissions which caused the Plaintiff and putative Class members to enter into a transaction (i.e. to purchase Defendants' Aerosol Antiperspirant Products). As such, Defendants' fraudulent activities occurred independent of the contract to purchase.

88.     Plaintiff and the other members of the Class reasonably relied upon such representations and omissions to their detriment.

89.     By reason thereof, Plaintiff and the other Class members have suffered damages in an amount to be proven at trial.

## COUNT IV

## Breach of Express Warranty

## (On Behalf of the Nationwide Class and All State Classes)

90.     Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

91.     Plaintiff and each Class member purchased the Defendants' Aerosol Antiperspirant Products from common retail settings. There was no learned intermediary between the manufacturer and the end-purchaser at the time of purchase and the express warranties were on the Aerosol Antiperspirant Product packaging, labeling, and via direct-to-consumer advertising.

92.     Plaintiff and each Class member formed a contract with Defendants at the time Plaintiff and the other Class members purchased the Defendants' Aerosol Antiperspirant Products. The terms of the contract include the promises and affirmations and omissions of fact made by Defendants on their Aerosol Antiperspirant Product packaging, labeling, and through

marketing and advertising. This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain, and are part of the standardized contract that Defendants entered into with Plaintiff and each Class member.

93.     Defendants expressly warranted that its Aerosol Antiperspirant Products were fit for their ordinary use (i.e., as a safe product suitable for human application) that "reduces underarm perspiration." It also expressly warranted that its Aerosol Antiperspirant Products were not adulterated or misbranded.

94.     Plaintiff and each Class member read and relied on one or more of the express warranties provided by Defendants in the labeling, packaging and written advertisements in deciding to purchase the Aerosol Antiperspirant Products.

95.     Defendants' Aerosol Antiperspirant Products did not conform to Defendants' express representations and warranties because they were not manufactured in compliance applicable standards, were not suitable for human application, and were adulterated and misbranded.

96.     At all times relevant all the following States and Territories have codified and adopted the provisions of the Uniform Commercial Code: Ala. Code § 7-2-313; Alaska Stat. § 45.02.313; Ariz. Rev. Stat. Ann. § 47-2313; Ark. Code. Ann. § 4-2-313; Cal. Com. Code § 2313; Colo. Rev. Stat. § 4-2-313; Conn. Gen. Stat. Ann. § 42a-2-313; 6 Del. Code. § 2-313; D.C. Code. § 28:2-313; Fla. Stat. Ann. § 672.313; Ga. Code. Ann. § 11-2-313; Haw. Rev. Stat. § 490:2-313; Idaho Code § 28-2-313; 810 Ill. Comp. Stat. Ann. 5/2-313; Ind. Code Ann. § 26-1- 2-313; Kan. Stat. Ann. § 84-2-313; Ky. Rev. Stat. Ann. § 355.2-313; 11 Me. Rev. Stat. Ann. § 2-313; Md. Code. Ann. § 2-313; Mass. Gen. Law Ch. 106 § 2-313; Mich. Comp. Laws Ann. § 440.2313; Minn. Stat. Ann. § 336.2-313; Miss. Code Ann. § 75-2-313; Mo. Rev. Stat. § 400.2- 313; Mont.

Code Ann. § 30-2-313; Nev. Rev. Stat. U.C.C. § 104.2313; N.H. Rev. Ann. § 382- A:2-313; N.J. Stat. Ann. § 12A:2-313; N.M. Stat. Ann. § 55-2-313; N.Y. U.C.C. Law § 2-313; N.C. Gen. Stat. Ann. § 25-2-313; N.D. Stat. § 41-02-313; Ohio Rev. Code Ann. § 1302.26; Okla. Stat. tit. 12A § 2-313; Or. Rev. Stat. § 72.3130; 13 Pa. C.S. § 2313; P.R. Laws. Ann. Tit. 31, § 3841, et seq.; R.I. Gen. Laws § 6A-2-313; S.C. Code Ann. § 36-2-313; S.D. Stat. § 57A-2-313; Tenn. Code Ann. § 47-2-313; Tex. Bus. & Com. Code Ann. § 2-313; Utah Code Ann. § 70A2-313; Va. Code § 8.2-313; Vt. Stat. Ann. 9A § 2-313; W. Va. Code § 46-2-313; Wash. Rev. Code § 62A 2-313; Wis. Stat. Ann. § 402.313 and Wyo. Stat. § 34.1-2-313.

97.     At the time that Defendants marketed and sold their Aerosol Antiperspirant Products, it recognized the purposes for which the products would be used, and expressly warranted the products were suitable for human application and not adulterated or misbranded. These affirmative representations became part of the basis of the bargain in every purchase by Plaintiff and each Class member.

98.     Plaintiff and each Class member are natural persons who are reasonably expected to use, consume, or be affected by the adulterated and/or misbranded Aerosol Antiperspirant Products manufactured and sold by Defendants.

99.     Defendants breached their express warranties with respect to its Aerosol Antiperspirant Products because the products were not suitable for human application because they were adulterated with benzene and misbranded.

100.    Plaintiff and each Class member would not have purchased the Aerosol Antiperspirant Products had they known the products contained benzene, were not suitable for human application, did not comply with applicable standards, and/or were adulterated and misbranded.

101.    As a direct and proximate result of Defendants' breach of express warranty, Plaintiff and other Class members have been injured and suffered damages in the amount of the purchase price of their Aerosol Antiperspirant Products, and any consequential damages resulting from the purchases, in that the Aerosol Antiperspirant Products they purchased were so inherently flawed, unfit, or unmerchantable as to have no market value.

## COUNT V

## Breach of Implied Warranty

## (On Behalf of the Nationwide Class and All State Classes)

102.    Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

103.    Defendants were at all relevant times the manufacturers, distributors, warrantors and/or sellers of the Aerosol Antiperspirant Products. Defendants knew or had reason to know of the specific use for which its Aerosol Antiperspirant Products were purchased.

104.    Because the Aerosol Antiperspirant Products contain excessive levels of benzene, they were not of the same quality as those generally acceptable in the trade and were not fit for the ordinary purposes for which such Aerosol Antiperspirant Products are used.

105.    Plaintiff and members of the Class purchased the Aerosol Antiperspirant Products in reliance upon Defendants' skill and judgment and the implied warranties of fitness for the purpose.

106.    The Aerosol Antiperspirant Products were not altered by Plaintiff or members of the Class.

107.    Plaintiff and members of the Class were foreseeable users of the Aerosol Antiperspirant Products.

108.    Plaintiff and members of the Class used the Aerosol Antiperspirant Products in the manner intended.

109.    As alleged, the Aerosol Antiperspirant Products were not adequately labeled and did not disclose that they contain benzene.

110.    The Aerosol Antiperspirant Products did not measure up to the promises or facts stated in the written literature, media advertisement and communications by and from Defendants.

111.    Defendants impliedly warranted that the Aerosol Antiperspirant Products were merchantable, fit and safe for ordinary use.

112.    Defendants further impliedly warranted that the Aerosol Antiperspirant Products were fit for the particular purposes for which they were intended and sold. At the time Defendants marketed and otherwise placed its Aerosol Antiperspirant Products into the stream of commerce, it knew of the particular purpose for which Plaintiff and the Class members purchased the Aerosol Antiperspirant Products—to have a safe and effective antiperspirant, which did not contain any dangerous carcinogens. Defendants also knew that consumers, including Plaintiff and members of the Class, would have no ability or opportunity to determine the ingredients in the Aerosol Antiperspirant Products, but instead would rely on Defendants' representations that the Aerosol Antiperspirant Products were suitable for their particular purpose and free of dangerous carcinogens (i.e., benzene)

113.    Contrary to these implied warranties, the Aerosol Antiperspirant Products were defective, unmerchantable, and unfit for their ordinary use when sold, and unfit for the particular purpose for which they were sold.

114.    Further, as the intended consumers and ultimate users of the Aerosol

Antiperspirant Products, Plaintiff and the Class members are intended third-party beneficiaries of any contracts between Defendants and any retailers from whom Plaintiff obtained Aerosol Antiperspirant Products, which contain the implied warranty of merchantability and to be fit for ordinary purposes, safe and not hazardous to one's health. Plaintiff and the Class members, not any retailers, are the parties intended to benefit by any such contract because they are the people using the Aerosol Antiperspirant Products in the manner intended.

115.    In breach of the implied warranty of merchantability, the Aerosol Antiperspirant Products that Defendants provided to Plaintiff and the Class members are not fit and suitable for their ordinary purpose because, inter alia, they contain a dangerous carcinogen with the potential of causing serious injury and/or death. Defendants' Aerosol Antiperspirant Products supplied to Plaintiff and the Class members did not possess the basic degree of fitness for ordinary use due to the defects described herein. The defects are so basic that they render the Aerosol Antiperspirant Products unfit for their ordinary purposes. As such, they are not merchantable.

116.    As a direct and proximate result of Defendants' breach, Plaintiff and the Class members have suffered, and will continue to suffer, significant damages, loss and injury in an amount that will be established at trial.

## COUNT VI

### Strict Product Liability – Failure to Warn

### (On Behalf of the Nationwide Class and All State Classes)

117.    Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

118.    Defendants knew or should have known that their Aerosol Antiperspirant Products contained benzene, which is a known carcinogen.

119.    Defendants had a duty to warn Plaintiff and the Class about the presence of benzene in its Aerosol Antiperspirant Products.

120.     In addition, Defendants had a duty to warn Plaintiff and the Class about the dangers of the presence of benzene in their Aerosol Antiperspirant Products.

121.    Defendants knew that the risk of exposure to benzene from use of their products was not readily recognizable to an ordinary consumer and that consumers would not inspect the product for benzene content.

122.    Defendants did not warn Plaintiff and the Class that the Aerosol Antiperspirant Products contained benzene or about the dangers of the presence of benzene in their Aerosol Antiperspirant Products.

123.    Defendants failed to fulfill this duty when it made affirmative representations regarding the quality and safety of the Aerosol Antiperspirant Products as detailed above. Such affirmative representations regarding the safety of the Aerosol Antiperspirant Products constitute negligent misrepresentations which are independent of Plaintiff' economic loss.

124.    Plaintiff and other Class members have lost time finding alternative antiperspirants and deodorants as well as suffered from anxiety and apprehension associated with potential personal injury arising out of using Aerosol Antiperspirant Products adulterated with benzene.

125.    Plaintiff and the Class have suffered damages by purchasing Aerosol Antiperspirant Products in a manner promoted by Defendants, and in a manner that was reasonably foreseeable by Defendants, because benzene is a known carcinogen that is absorbed through inhalation and the skin. Plaintiff and the members of the Class would not have purchased Defendants' Aerosol Antiperspirant Products had they known they contained benzene.

126.    Plaintiff and the Class were justified in their reliance on Defendants' labeling and advertising of the product for use as an antiperspirant and/or deodorant.

127.    Plaintiff and the Class have suffered damages in an amount to be proven at trial.

## COUNT VII

## Strict Product Liability – Manufacturing Defect

## (On Behalf of the Multi-State Class and All State Classes)

128.    Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

129.    The Aerosol Antiperspirant Products contained a manufacturing defect when they left the possession of Defendants. Specifically, the Aerosol Antiperspirant Products differ from Defendants' intended result or from other lots of the same product line because they contain excessive levels of benzene.

130.    Plaintiff and members of the Class used the Aerosol Antiperspirant Products in a way that was reasonably foreseeable to Defendants.

131.    As a result of the defects in the manufacture of the Aerosol Antiperspirant Products, Plaintiff and the Class suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment against the Defendants as to each and every count, including:

A.    An order declaring this action to be a proper class action, appointing Plaintiff and her counsel to represent the Class/Sub-Classes, and requiring Defendants to bear the costs of class notice;

B.    An order enjoining Defendants from selling the Aerosol Antiperspirant Products;

C.     An order enjoining Defendants from suggesting or implying that they are safe and effective for human application;

D.     An order requiring Defendants to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling all Aerosol Antiperspirant Products contaminated with benzene;

E.     An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendants from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendants' past conduct;

F.     An order requiring Defendants to pay restitution/damages to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising in violation of the above-cited authority, plus pre- and post-judgment interest thereon;

G.     An order requiring Defendants to disgorge any ill-gotten benefits received from Plaintiff and members of the Class/Sub-Classes as a result of any wrongful or unlawful act or practice;

H.     An order requiring Defendants to pay all actual and statutory damages permitted under the counts alleged herein;

I.     An order awarding attorneys' fees and costs to Plaintiff and the Class/Sub-Classes; and

J.     An order providing for all other such equitable relief as may be just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.


DATED: December 28, 2021.



By:  /s/R. Jason Richards
AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
R. JASON RICHARDS (FL Bar # 18207)
BRYAN F. AYLSTOCK (FL Bar # 0078263)
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: 850-202-1010
Facsimile: 850-916-7449
E-mail: jrichards@awkolaw.com
Email: baylstock@awkolaw.com


*Attorneys for Plaintiff*